UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

PHILLIPS                                      CIVIL ACTION NO. 18-00824

VERSUS                                        JUDGE ROBERT G JAMES

U S COMMISSIONER OF SOCIAL       MAGISTRATE JUDGE WHITEHURST


## REPORT AND RECOMMENDATION

Before the Court is an appeal of the Commissioner's finding of non-disability filed by pro se claimant, Crystal Phillips. Considering the administrative record, the briefs of the parties, and the applicable law, it is recommended that the Commissioner's decision be affirmed and this matter be dismissed with prejudice.

## Administrative Proceedings

The claimant, Crystal Phillips, fully exhausted her administrative remedies before filing this action in federal court. On January 15, 2015, claimant through her attorney, filed applications for a period of disability, disability insurance benefits ("DIB") and supplemental security income benefits ("SSI") alleging that she became disabled on December 13, 2013. *Tr. 9-1, p. 15.* Her applications were denied. *Id.* She requested a hearing, which was held via video on October 19, 2016 before Administrative Law Judge Mary Gattuso. *Id. p. 35.* Claimant was represented by counsel during the hearing. The ALJ decided that the claimant was not disabled

1

within the meaning of the Social Security Act from December 13, 2013 (the alleged disability onset date) through April 4, 2017 (the date of the decision). Claimant, through her counsel, requested review of the decision, but the Appeals Council found no basis for review. *Id., p. 5.* Therefore, the ALJ's decision became the final decision of the Commissioner for the purpose of the Court's review pursuant to 42 U.S.C. § 405(g). Claimant, *pro se*, then filed this action seeking review of the Commissioner's decision.

## Summary of Pertinent Facts

The claimant was born in 1984. At the time of the ALJ's decision, She was 33 years old, considered a younger individual. Claimant alleged that he has been disabled since December 13, 2013 due to seizure disorder, dysfunction of a major (right leg) joint, obesity and anxiety and mental disorders including attention deficient disorder (ADD). *Id., p. 17.*

### 1. Mental Disorders

The claimant underwent a consultative psychologica1 examination conducted by David N. Landry, Ph.D. on September 7, 2014. *Tr. C 1F/3.* She served as her own informant during the clinical interview and provided historical information. Dr. Landry reported that no symptoms of exaggerating or malingering were detected; however, claimant was a poor historian and was unable to provide accurate

background information. She reported that she has memory loss and cannot remember details about her history. *Tr. C1F/3*.

The claimant said that she has two children (ages 15 and 13) and has been married twice. *Tr. C1F/3*. Regarding her educational history, the claimant said that she quit school in the 9th grade and received Special Education Services throughout her formal schooling.   She reported that her grades were consistently below average and she never attempted to obtain a GED. *Tr. C1F/3, 4*. She reported that she had a history of speech problems and that she was diagnosed with ADHD as a child and prescribed Ritalin to augment attention. She was unable to provide details regarding when she discontinued the medication and whether or not the medication was effective. *Tr. C1F/3, 4*.

Regarding her medica1 history, the claimant said that she was diagnosed with a seizure disorder several months earlier and was having approximately four seizures per month prior to her diagnosis. She reported that she has severe memory problems and disorientation during seizure episodes; she typically falls down and injures herself during her seizures and, during her last seizure, she fell down, and injured her leg and since that time, she has also experienced leg weakness. *Tr. C1F/3, 4*.

The claimant was wearing a cast on her leg and reported that she was prescribed anti-seizure medication and a home health service takes care of her daily

in the afternoons. She stated that she is able to dress herself independently, but requires assistance with showering and is not able to perform household chores or cook due to her leg injury and requires assistance from a home health worker and from her family to perform most activities of daily living. *Tr. C1F/4*. She stated that her mood fluctuates daily; she stated that she has a history of anxiety since adolescence, but has never been medicated for these symptoms. She reported that she experiences shaking hands, sweatiness, bites her fingernails, experiences confusion and disorientation, is forgetful of conversations and frequently loses items. *Tr. C1F/2*.

Dr. Landry observed that the claimant was a partially ambulatory female with average height and slightly overweight. She wore a leg brace, had some difficulty walking and walked slowly and cautiously. She was appropriately dressed and groomed, was polite and cooperative and was motivated when completing cognitive testing, but mumbled to herself when completing tasks. Her expressive language was impaired, as she displayed articulation deficits. She frequently repeated herself and she was difficult to understand when she spoke. *Tr. C1F/4, 6*.

On the Wechsler Adult Intelligence Scale-IV (WAIS-1V), the claimant obtained a Full-Scale Standard Score 61. Findings were felt to be a reliable and valid estimate of her current functional status. Dr. Landry diagnosed her with anxiety

4

disorder, not otherwise specified and mild mental retardation. *Tr. C1F/4, 5.*He opined that the claimant's ability to understand, recall, and carry out simple instructions was not significantly impaired. Her ability to understand, recall, and carry out detailed instructions was most likely impaired by her intellectual capacity; however, "her ability to sustain attention to perform simple, repetitive tasks for two-hour blocks of time does not appear impaired from a mental health standpoint. Her ability to get along with others in a work setting, including co-workers and supervisors, does not appear impaired at this time. Given her intellectual capacity, she would not be considered capable of managing her own personal financial affairs at this time." He felt that she might benefit from a consultation with a psychiatrist to evaluate the benefits of psychotropic medication to treat her anxiety symptoms. *Tr. C1F/6.*

The claimant first sought mental health treatment when presented to Surrey Street Community Health Center on April 19, 2016, to establish mental health care with psychiatrist Neha Kansara, M.D. The claimant subjectively reported feeling depressed with poor sleep, no interests, poor concentration and "too much energy," but also having fatigue. She reported having panic attacks associated with shortness of breath, palpitations, choking, sweating, shaking, fear of dying, numbness, chest tightness, abdominal distress, hot flashes and dizziness/light headedness. These

symptoms usually last for 30-40 minutes and subsides by her passing out and having a seizure. She denied having any attention deficit hyperactivity disorder symptoms, but reported having impulse control symptoms: "Patient reports engagement in dysfunctional behavior and explosive tantrums in order to release tension. She said that she hurts people, throws things around and chased her husband with a butcher knife." *Tr. C15F/3*. Her husband reported that she has anger issues, can be fine one minute and could then be "flipping out on people." He reported that she "runs around the house with a butcher knife" trying to hurt him. The claimant reported that she had a legal problem for, "pulling a knife" on her brother. *Tr. C15F/1*.

On mental status exam, the examiner reported that claimant's cognitive functioning was below average; her speech was abnormal, slurred, muffled and difficult to understand; Her gait and stance were normal; She appeared unkempt; Her mood was "dysthemic [chronic depression] I don't know"; Her thought content was tangential but thought process was not impaired. The claimant was diagnosed with bipolar I disorder with rapid cycling, generalized anxiety disorder, impulse control disorder, intellectual disabilities and delayed post-traumatic stress disorder. She was prescribed Klonopin, Vistaril and Seroquel. *Tr. C15F/4*.

When seen for follow up on May 17, 2016, Dr. Kansara noted that the claimant tested positive for THC on her drug screen and discussed the effects of

THC on the brain and interaction with medications. The claimant stated that someone rolled it in a cigarette and probably gave it to her. The claimant denied any symptoms of mood instability, but said that the medications make her tired. *Tr. C15F/1.*

Dr. Kansara's notes indicate that claimant had normal appearance and grooming, no behavioral abnormalities and her mood was euthymic (stable). Her affect was blunted and her speech was slurred. Thought processes and thought content were not impaired. Dr. Kansara changed her diagnoses to Bipolar disorder unspecified, Impulse control disorder not otherwise specified, generalized anxiety disorder and unspecified intellectual disability. She discontinued Vistaril because of sedation and increased her dosage of Klonopin. *Tr.C15F/1, 2.*

On August 3, 2016, the claimant was transported to the emergency department at Franklin Hospital after complaints of a headaches and chest pain while being taken into police custody. She stated that she has a history of severe anxiety that is worse when she interacts with the police. While in the emergency department, she was calm and cooperative and stated that she became emotional when being arrested. Her examination included an electrocardiogram which was normal. She improved and was released to the deputy's custody. *Tr. 14F/47, 52, 53, 56.*

The claimant saw Dr. Katherine Dela Rosa on December 9, 2016. She

complained of body numbness and headaches. She said that she had a CT scan done and it was normal and she was told that she had a panic attack. She denied any recent seizures or having knee or leg pain. She said that she had not seen psychiatry since summer and was having worsening panic attacks. Her knees showed no abnormalities; she had no tenderness to palpation and no knee instability. *Tr. C17F/4, 5*.

The claimant did not return to psychiatry at Surrey Street Community Health Center until December 22, 2016 at which time she had been out of her medications since July and reported having mood swings and panic attacks. Her cognitive functioning, speech coordination, behavior, attitude, gait and stance were normal. Her mood was dysthymic, labile and depressed and her affect was constricted. She was diagnosed with Bipolar I disorder, most recent episode, depressed and prescribed Klonopin, Effexor, Rexulti, Adderall and Prazosin. *Tr. C17F/1, 2*.

### 2. *Seizure Disorder*

The claimant underwent a head CT scan at lberia Medical Center because of a seizure on December 16, 2013, which was normal. *Tr 12F/7*. On March 23, 2014, she presented to Dauterive Hospital complaining of a headache after having a seizure. She had a history of seizures, but had not been taking her seizure medication. Review of systems was positive for fatigue and nausea and she vomited while in the

emergency room.

On physical examination, the claimant was alert, oriented, cooperative, in no acute distress, well developed, well nourished, and appeared her stated age. She moved all extremities equally; her motor strength was strong and equal bilaterally and she had no joint enlargement, swelling or tenderness and no erythema. She had no scoliosis or kyphosis and normal lumbar lordosis with no deformity appreciated and pelvic alignment was normal. In her extremities, she had normal range of motion and strength with no joint enlargement, swelling or tenderness, and no erythema or peripheral edema. Her speech pattern was normal with no dysarthria. She had normal gait, was oriented to person, place, time, and had no sensory loss or weakness. Her mood and affect were appropriate for current situation and she had no depression, agitation, hallucinations or suicidal ideations. All 12 cranial nerves assessed were normal. She was diagnosed with a seizure disorder and headaches and discharged. *Tr. C4F/37, 38, 40.*

On March 24, 2014, the claimant presented to the emergency department at Opelousas General with complaints of nausea and vomiting. She reported having a seizure prior to the onset of the nausea and vomiting. On examination, she was awake, alert and fully verbal. Her ambulation was normal and she had intact range of motion in all extremities. She stated that she felt much better. She stated "[t]his

always happens when I miss my medicine." Her husband reported that she missed a dose her seizure medication and then had onset of vomiting. She was anxious, but in no acute distress and her mood and affect were normal. She had full range of motion in all extremities. She was diagnosed with seizure disorder, nausea and vomiting and discharged. *Tr. C5F/5-9.*

The claimant walked into the emergency department at Opelousas General on May 23, 2014, requesting more seizure medication because she ran out and had a seizure two days prior. She was awake, alert and fully verbal with normal ambulation. The staff reported that the claimant comes to Opelousas General frequently to refill her seizure medication. She was informed that her Medicaid is linked to the Iberia Comprehensive Health Unit with Dr. Ramsey. She said that she was familiar with Dr. Ramsey, had been there before and knew the phone number. She initially stated that she missed her appointment with her primary care physician recently due to having a seizure and was rescheduled at the end of June. Then, the RN stated that she said that she had actually never been to the provider and they were to call her back Monday with a reschedule. Her examination was normal except for dental caries and poor dental hygiene and she had normal mood and affect. *Tr. C5F/13-15.*

On June 10, 2014, the claimant was seen as a walk-in by Carmen Brown, FNP

10

at Iberia Comprehensive Community Health Clinic ("Iberia Comprehensive"). She requested a refill on her seizure medication and complained that the medicine is not working. She was diagnosed with generalized epilepsy. The results of a blood test showed a very low level of Keppra at 1.3 (normal reference range 5.0 to 63). She was prescribed Keppra 1,000 mg. and Ibuprofen 600 mg. *Tr. C6F/9, 10 and 7F.*

The claimant presented at Dauterive Hospital on June 17, 2014 after having a mild seizure at home. She was off her Keppra. She was in no acute distress, alert and fully oriented; her mood and affect were appropriate with no depression, agitation, no pressured speech and no dysaithria (difficult/unclear articulation of speech). Neurological examination was grossly intact. She was restarted on Keppra and told to follow up with her primary care physician. *Tr. C4F/28-30.*

On July 2, 2014, at Iberia Comprehensive, the claimant reported that her seizures had been improving since increasing her medications. *Tr. C6F/7, 8.*

On December 8, 2014, the claimant had a seizure while visiting someone at Dauterive Hospital. The emergency room staff witnessed the seizure and noted that she lost consciousness, generally shook all over her body, and was confused and combative afterwards. She had no motor deficits. She improved, was fully awake and oriented and was discharged. *Tr. C4F/11, 12.*

The day after she had the seizure, December 9, 2014, the claimant presented

11

to Franklin Foundation Hospital. She indicated that she had missed a recent dose of her Keppra. She reported loss of consciousness and post ictal seizure and confusion. Her examination was normal and she was fully oriented, had normal speech, mood and affect and no motor deficits. *Tr. C3F/4, 5*.

On December 21, 2014, she presented to Opelousas General in a wheelchair after having a seizure. She was out of her Keppra. She was brought in by a friend and, it appeared that she had been off her Keppra for a couple of months. The seizure was witnessed, lasted several minutes and the emergency department staff felt it was a characteristic tonic clonic (grand mal) seizure. No current seizure activity was observed, but she was confused and postictal (altered state of consciousness) and had bitten her tongue. She had a baseline normal neurologic status and normal baseline functional capacity. On physical exam, she was noted to be in mild distress at the beginning of the examination. She appeared older than her stated age and she had poor general hygiene. She was diagnosed with a grand mal seizure and was ambulatory on discharge. *Tr. C5F/20-25*.

The claimant returned to her primary care provider, Katherine Dela Rosa, M.D. at Iberia Comprehensive on March 12, 2015 at which time she was again prescribed Keppra 1,000 mg. BID. *Tr. C6F/2, 4*.

On May 28, 2015, she was brought to Lafayette General Medical Center via

12

ambulance after suffering a seizure while sleeping. She reported that she did not take her Keppra because she had fallen asleep. Her post ictal symptom was confusion. She had no other symptoms including musculoskeletal. *Tr. C11F/5.*

On neurological examination, the claimant was alert and oriented to person, place, time, and situation. No focal neurological deficit was observed and all 12 Cranial Nerves were intact. She had normal sensory and examinations, normal speech, normal coordination and normal back and musculoskeletal range of motion. She said that she feels fine and is ready to go home. She was continued on Keppra as previously prescribed. *Tr. C11F/7, 9.*

The claimant was brought to Lafayette General Medical Center again on June 17, 2015. She had gone to a casino the night before with her mother and missed both her previous evening and her morning doses of Keppra and presented to the hospital after possibly having a seizure the night before and then one again in the morning. It was noted that she had a subtherapeutic Keppra send-out level from her last emergency department visit three weeks earlier. *Tr. C11F/11.* In giving her history to the emergency room staff, the claimant said that she had been having about 15 seizures a month since December of 2013 and that her last seizure was one week ago. She admitted that she forgot to take her medication the day before and does "forget to take them every now and then." She had no postictal symptoms and no

13

other associated symptoms. Risk factors consisted of non-compliance. Neurological examination was normal as was back and musculoskeletal examinations. Psychiatrically, she was cooperative with appropriate mood and affect and normal judgment. *Tr. C11F/11, 13, 14.*

On January 30, 2016, the claimant again had a seizure and was taken to Lafayette General Medical Center. She said that she had been compliant with taking her medicine, but still suffered a seizure. She had no loss of consciousness and no post ictal symptoms. She reported having a cough and sinus congestion and was taking Nyquil. She complained of lower lumbar pain, difficulty urinating, head pain, and right flank pain. *Tr. C11F/17.*

The claimant was alert and oriented to person, place, time, and situation. No focal neurological deficit was observed, all Cranial Nerves were intact and she had normal sensory, motor and speech. She had normal musculoskeletal range of motion and normal strength. On psychiatric examination, she was cooperative with appropriate mood and affect and normal judgment. She was diagnosed with a seizure and her Keppra dosage was increased to 1,250 mg. BID. *Tr. C1F/18, 20.*

After not being seen by Dr. Rosa at Iberia Comprehensive since March 12, 2015, the claimant returned on February 11, 2016 for refills of her seizure medications. Dr. Rosa noted that she was non-compliant with follow up and labs,

had "numerous" no shows for medication refills and did not follow up with neurology. Physical examination was normal and her knees showed no abnormalities. The claimant requested to be put back on her medications for schizophrenia, bipolar disorder and ADD and said that she was taken off them when she was pregnant. *Tr. C15F/6.*

On April 15, 2016, the claimant presented to Lafayette General Medical Center complaining of a headache for the past two weeks and stated that she had a seizure three days earlier. She also complained of ear pain. At worst, her pain was moderate as it was that day. She said that her headache was aggravated by light and she had altered vision. *Tr. C11F/22.* The claimant had normal back and musculoskeletal range of motion and no tenderness and on psychiatric examination, she was cooperative with appropriate mood and affect. She was given oxygen therapy and felt better, although the headache was not completely resolved. She was diagnosed with a migraine headache and discharged. *Tr. C11F/24, 25.*

On June 6, 2016, the claimant presented to the emergency department at Franklin Foundation Hospital stating that she thinks she had a seizure the night before while staying at the casino. She was in no acute distress, fully oriented and had normal neurological psychiatric examination. When the nurse went to give her Ativan, the claimant was gone and had left the linens on the floor. *Tr. 14F/36, 41,*

15

*44*.

### 3. *Joint Disorder*

On May 29, 2014, the claimant presented to the emergency department at Dauterive Hospital with complaints of a right knee injury after falling from her steps at home three days ago. Her examination was normal including musculoskeletal with bilateral strong equal motor strength and no right knee deformity or contusion. Right knee x-rays revealed no acute fracture or dislocation. She had no soft tissue swelling and the articular surfaces and spaces were preserved. She was diagnosed with right knee strain. *Tr. C4F/31, 33, 34*.

On June 10, 2014, the claimant was seen at Iberia Comprehensive. She complained of knee pain and had pain elicited with motion and tenderness in her right knee with ambulation, but no tenderness to palpation. On physical examination, the claimant's blood pressure was 124/92; she weighed 215 pounds and was 62 inches tall with a body mass index of 39.3. She was diagnosed with right knee pain and prescribed Ibuprofen 600 mg. *Tr. C6F/9, 10*.

The claimant presented to Iberia Comprehensive on July 2, 2014. She stated she had been in the hospital the prior week due to leg pain and that her leg gave out on her and she fell on her back. She reported having right knee pain with standing and that her knee felt stiff and "loose". On exam, her right knee showed swelling and

laxity. It was tender on palpation, unstable, and tenderness was observed on ambulation. She was told to use an ACE bandage and NSAIDs. *Tr. C6F/7, 8.*

Approximately 3 weeks later, on July 31, 2014, the claimant presented to Franklin Foundation Hospital with complaints of weakness, dizziness and feeling dehydrated after walking from Opelousas to another town in the middle of the day. Her mood and affect were normal and was diagnosed with heat exhaustion. She subsequently reported feeling "great" and was discharged. *Tr. C3 F/7, 8.*

On January 12, 2015, the claimant was brought to Opelousas General via ambulance after falling off some steps at her home. She complained of moderate pain to her neck, knee, and foot. It was reported that she was awake, alert, oriented and fully verbal with clear speech, but it was also reported that she had some speech impediment and was hard to understand. Her cervical spine, right knee and right foot x-rays were normal. Her examination was unremarkable and she was in no acute distress. She had mild tenderness to the dorsum of the right foot; she refused to bear weight on her right leg and her knee had mild swelling, but no focal tenderness and she has good active range of motion of the right knee. She was diagnosed with history of fall with foot and knee injury and discharged. She was told to use rest, ice packs and Tylenol. *Tr. C5F/29-32.*

On January 15, 2015, the claimant presented to the emergency department at

Lafayette General Medical Center complaining she had slipped and fallen three days ago and injured her left shoulder, left thumb, and her right leg. Her degree of pain was minimal. She was alert, fully oriented, in no acute distress and had no vision problems, anxiety or headaches. She had normal musculoskeletal range of motion and strength and no tenderness, swelling or deformity. No focal neurological deficits were observed and she was cooperative with appropriate mood and affect. She was diagnosed with cervical and shoulder sprain and discharged with a prescription for a three-day supply of Toradol. *Tr. C11F/1-3.*

The claimant's January 23, 2015 visit to Iberia Comprehensive for refills on her seizure medication indicated that her physical examination was normal. *Tr. C6F/2.*

The claimant again presented to the emergency department at Opelousas General on February 6, 2015. She said that she tripped on an uneven floor in a home and twisted her right knee. She also said that she fell on her right side and cannot move her right leg. On triage, she was non-urgent, awake, alert and fully verbal. She complained of pain to her right anterior thigh, right anterior knee, right shin and right hip and iliac crest. It was noted that she was well developed, well-nourished and alert, did not appear to be in acute distress and had no evidence of significant external trauma. *Tr. C5F/33-35.* On musculoskeletal examination, she had mild to moderate

joint pain with movement of the right anterior knee and was moderately tender to palpation over the right anterior knee, but had no evidence of soft tissue swelling or palpable effusion over the right anterior knee and no sign of contusion. The rest of the knee exam was "OK" with no acute instability or subluxation. The distal neurovascular exam was "OK" with good dorsalis pedis, and grossly intact sensory exam. She had normal mood and affect. *Tr. CSF/35.*

## Analysis

### A. Standard of Review

Judicial review of the Commissioner's denial of disability benefits is limited to determining whether substantial evidence supports the decision and whether the proper legal standards were used in evaluating the evidence. *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990). "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983) Substantial evidence "must do more than create a suspicion of the existence of the fact to be established, but 'no substantial evidence' will only be found when there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'" *Id.*

If the Commissioner's findings are supported by substantial evidence, they are

conclusive and must be affirmed. 42 U.S.C. § 405(g); *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995). In reviewing the Commissioner's findings, a court must carefully examine the entire record, but refrain from re-weighing the evidence or substituting its judgment for that of the Commissioner. *Hollis v. Bowen*, 837 F.2d 1378, 1383 (5th Cir. 1988); *Villa v. Sullivan*, 895 F.2d at 1022. Conflicts in the evidence, *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985), and credibility assessments, *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991), are for the Commissioner to resolve, not the courts. Four elements of proof are weighed by the courts in determining if substantial evidence supports the Commissioner's determination: (1) objective medical facts, (2) diagnoses and opinions of treating and examining physicians, (3) the claimant's subjective evidence of pain and disability, and (4) the claimant's age, education and work experience. *Id.*

## B. Entitlement to Benefits

The Disability Insurance Benefit ("DIB") program provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and disabled, regardless of indigence. *See* 42 U.S.C. § 423(a). The Supplemental Security Income ("SSI") program provides income to individuals who meet certain income and resource requirements, have applied for benefits, and are disabled. 42 U.S.C. § 1382(a)(1) & (2).

A person is disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). A claimant is disabled only if his physical or mental impairment or impairments are so severe that he is unable to not only do his previous work, but cannot, considering his age, education, and work experience, participate in any other kind of substantial gainful work which exists in significant numbers in the national economy, regardless of whether such work exists in the area in which the claimant lives, whether a specific job vacancy exists, or whether the claimant would be hired if he applied for work. 42 U.S.C. § 1382c(a)(3)(B).

## C. Evaluation Process and Burden of Proof

The Commissioner uses a sequential, five-step approach to determine whether a claimant is so disabled.   This process requires the ALJ to determine whether the claimant (1) is currently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) is able to do the kind of work he did in the past; and (5) can perform any other work. 20 C.F.R. §§ 404.1520(a)(4). "A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the

analysis." *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994).

Before going from step three to step four, the Commissioner assesses the claimant's residual functional capacity, 20 C.F.R. § 404.1520(a)(4), by determining the most the claimant can still do despite his physical and mental limitations based on all relevant evidence in the record. 20 C.F.R. § 404.1545(a)(1). The claimant's residual functional capacity is used at the fourth step to determine if he can still do his past relevant work and at the fifth step to determine whether he can adjust to any other type of work. 20 C.F.R. § 404.1520(e).

The claimant bears the burden of proof on the first four steps; at the fifth step, however, the Commissioner bears the burden of showing that the claimant can perform other substantial work in the national economy. *Graves v. Colvin*, 837 F.3d 589, 592 (5th Cir. 2016). This burden may be satisfied by reference to the Medical-Vocational Guidelines of the regulations, by expert vocational testimony, or by other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). If the Commissioner makes the necessary showing at step five, the burden shifts back to the claimant to rebut this finding. *Id.* at 1302; *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005). If the Commissioner determines that the claimant is disabled or not disabled at any step, the analysis ends. *Greenspan*, 38 F.3d at 236.

### D. **The ALJ's Findings and Conclusions**

It is undisputed that the claimant last met the insured status requirements of the Social Security Act on June 30, 2002. The ALJ determined, at step one, that the claimant has not engaged in substantial gainful activity since December 13, 2013. *Tr. 17.*   This finding is supported by substantial evidence in the record.

At step two, the ALJ found that the claimant has the following severe impairments: seizure disorder, dysfunction of a major joint, obesity and anxiety, affective and organic mental disorders. *Tr. 17.* This finding is supported by substantial evidence in the record.

At step three, the ALJ found that the claimant has no impairment or combination of impairments that meets or medically equals the severity of a listed impairment. *Tr. 18.* The claimant does not challenge this finding.

The ALJ found that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that she can never climb ladders, ropes or scaffolds; can occasionally balance, stoop, crouch, kneel, crawl and climb ramps and stairs. She cannot work with moving and or dangerous machinery; cannot work at unprotected heights; and cannot engage in commercial driving. She is limited to unskilled work that involves routine, repetitive tasks, and to low stress work such as work that does not involve strict production

quotas or fast paced work. She must have no direct contact with public and can have only occasional and superficial interaction with supervisors and coworkers. The Court construes the claimant's response as challenging this finding.

At step four, the ALJ found that the claimant is not capable of performing any past relevant work. *Tr. 34*. The claimant did not challenge this finding.

At step five, the ALJ found that the claimant was not disabled from December 13, 2013 through April 4, 2017 (the date of the decision) because there are jobs in the national economy that he can perform. *Tr. 35*. The Court construes the claimant's response as challenging this finding.

**E.   The Allegations of Error**

While the claimant does not contend that the ALJ made any errors by improperly evaluating the medical opinion evidence, the Court will address the claimant's argument that she "shouldn't have been denied" because she has "seizure epilepsy," others do not understand what she is saying, her leg gives out causing her to fall, and she cries a lot. *R. 12, p. 2.*

**F.  Whether Substantial Evidence Supports the ALJ's Disability Determination**

The ALJ generally found that while the claimant alleges "fairly severe limitations.... [they] are inconsistent with evaluations and the weight of objective and clinical evidence." In particular, the claimant's own account of her daily living

24

activities included limited assistance in all aspects except that she required extensive assistance in bathing herself. Thus, she reported that since July 2014 Medicare provided a home health nurse to watch her and bathe her. The ALJ noted, however, that the claimant also reported taking a shower at 10:00 PM and going to bed at 10:30 PM. Contrary to her statement about home health care, this would be at a time when the nurse was not there. Moreover, she stated that her husband cooks and takes care of her children and that she can only walk 10 feet and uses a walker. The ALJ further noted that the record failed to document conditions that would require such home health care.

The ALJ found that the claimant's reported limitations are not supported by medical evidence that reveals repeated normal physical and mental status examinations. In particular she noted that the claimant has been consistently non-complaint with her seizure medication and has had very little treatment with her primary care provider. These facts along with her casino attendance draw into question her need for home health care.[1] Finally, the ALJ stated, "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms, however, the claimant's statements concerning the intensity,

---

1 The ALJ noted that the claimant was wearing a full leg brace and had some difficulty ambulating when she saw Dr. Landry in September, 2014. The ALJ speculated that the leg brace may have resulted in her requiring assistance with bathing at that time. *Tr. 9-1, p. 27.*

persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." *Id., p. 28.*

The claimant argues that the ALJ failed to property consider her claims of "seizure epilepsy," speech impediment, joint disorder and anxiety. As to the claimant's "seizure epilepsy," the ALJ initially considered Listing 11.02, for convulsive epilepsy, or grand mal seizures, specifically subsection 11.02(A): "Generalized tonic-clonic seizures occurring at least once a month for at least 3 consecutive months despite adherence to prescribed treatment." While the ALJ found that the claimant did not have evidence of seizures occurring at least once a month for at least three consecutive months, she further found that the claimant's medical records indicated the claimant herself stated that her seizures occurred when she did not take Keppra, her prescribed medication. When she was compliant with her Keppra her seizures were controlled.

As to the claimant's generalized tonic-colonic seizures, the ALJ specifically stated that when treated for seizures, the claimant's examinations have been normal and the vast majority of the time she reported that she did not take her Keppra. *Id.* The ALJ noted that her treating physician, Dr. Rosa, noted that the claimant was non-compliant with follow up and lab and failed to show-up for medication refills. Moreover, The ALJ also addressed specific instances of Plaintiff's noncompliance

with her treatment regimen. She observed that Plaintiff "often reports that she is not taking her medication" *Id., p. 18.* The ALJ noted that Plaintiff had "been consistently non-compliant with her seizure medication and has had very little treatment with her primary care provider" *Id., p. 19.* 20 C.F.R. § 404.1530; *Lovelace v. Bowen,* 813 F.2d 55, 59 (5th Cir. 1987) (A medical condition that can reasonably be remedied either by surgery, treatment, or medication is not disabling.). "Instead, [Plaintiff] relied on various emergency departments in several different geographical locations including New Iberia, Opelousas, Lafayette and Franklin, Louisiana, usually after not taking her seizure medications" *Id.* The ALJ further found that Plaintiff's treatment in so many "different places and her casino attendance draws into question her need for home health care." *Id. Villa v. Sullivan*, 895 F.2d 1019, 1024 (5th Cir. 1990) (ALJ may rely on the lack of treatment as an indication of nondisability).

As to her speech deficit, the ALJ found that the claimant's speech has been reportedly normal as observed by medical providers on numerous times even after she had seizures. While the ALJ noted Dr. Landry's and Dr. Kansara's notes related to their psychological consultation/examination that indicated the claimant's speech was "abnormal," "slurred," "muffled" and/or "difficult to understand," she found that her speech was otherwise repeatedly indicated as being normal. [2] In her

---

2 The ALJ noted one exception to these findings. "[O]n January 12, 2015, it was reported that she was awake, alert,

determination of the claimant's RFC to perform light work, however, the ALJ accommodated the claimant's concerns as to her speech deficiency in that the claimant was limited having no direct contact with the public and only occasional and superficial interaction with supervisors and coworkers.

The ALJ found no evidence of a joint disorder from her medical providers related to the claimant's complaint that her right leg gives out. While there was evidence that she fell, on those occasions she did not report that her leg had given out. On two occasions, she reported that she fell off stairs and that she tripped on uneven flooring. The evidence shows that she quickly recovered from her related injuries from these events and had normal physical examinations. Further, the ALJ found that the claimant's statement that she walked to a town near Opelousas and her husband's statement that the claimant "runs around the house with a butcher knife" trying to hurt him, were not consistent with her allegations of knee pain and her leg giving out.

The Court construes the claimant's statement "she cries a lot" as supporting her mental impairment—affective, anxiety and impulse control disorders. As to this limitation, the ALJ considered Listings 12.02, 12.04, 12.05, and 12.06, and 12.08,

---

oriented and full verbal with clear speech, but it was also reported that she had some speech impediment and was hard to understand." *R. 9-1, p. 28.*

and found that "the severity of the claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria" of these Listings. Specifically, the ALJ determined that the claimant's mental impairments did not result in at least one extreme or two marked limitations in a broad area of functioning (understanding, remembering, or applying information; interacting with others, concentrating, persisting or maintaining pace; or adapting or managing herself). She further stated that the claimant's ability to participate in standardized testing of intellectual function in which she had Full Scale IQ scores of 61 and 80, and her ability to engage in productive employment disputes that her disorder began before the age of 22.

In making her determination, the ALJ gave Dr. Landry's consultative opinion great weight. Dr. Landry opined that the claimant does not appear impaired in her ability to get along with others in a work setting; her ability to sustain attention to perform simple, repetitive tasks for two-hour blocks of time; and from a mental health standpoint. The ALJ further noted that the claimant did not seek any mental health treatment until the spring of 2016. After her initial psychiatric visit, she responded well to treatment and in May 2016, the claimant had normal appearance and grooming, no behavioral abnormalities, her mood was euthymic and her thought processes and thought content were not impaired. The claimant did not seek

psychiatric care again until December 22, 2016, at which time she had been out of her medications since July. The ALJ found, therefore, that the claimant only had evidence of seeking treatment for mental conditions on three occasions and she responded well when she was compliant with mental health treatment. Thus, the record contains no evidence of ongoing medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of a mental disorder as required by the 12.00 Listings. The Court thus finds that the ALJ properly found that plaintiff does not meet any 12.00 Listing.

The ALJ's lengthy decision and ruling in this action reveals a thorough consideration of the claimant's medical evidence. The Court finds that the ALJ's RFC finding is supported by substantial evidence.

## Conclusion and Recommendation

Given the foregoing, this Court recommends that the decision of the Commissioner be AFFIRMED and this matter be dismissed with prejudice.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen days from receipt of this report and recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen days after

receipt of a copy of any objections or responses to the district judge at the time of filing.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of receipt, or within the time frame authorized by Fed. R. Civ. P. 6(b) shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the district court, except upon grounds of plain error. *See Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996).

**THUS DONE AND SIGNED** this 26th day of July, 2019.

_____
UNITED STATES MAGISTRATE JUDGE